UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 22-cr-10123-WGY |
| v. | ) | |
| | ) | **FILED PATRIALLY UNDER SEAL** |
| JIALI WANG, | ) | (Motion for Leave to File Pending) |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For approximately six years, Defendant Jiali Wang led and participated in a sophisticated market manipulation scheme aimed at the U.S. securities markets that was perpetrated primarily from China. Using age-old manipulation tactics, including the use of brokerage accounts in others' names and coordinated trading on opposite sides of the market, the scheme fraudulently exploited nuances in modern market structure to generate millions of dollars in illicit profits. Specifically, the scheme tricked institutions providing market liquidity to trade at artificial prices, thereby harming the integrity and efficiency of U.S. markets for retail investors. Following his October 2019 arrest and later invocation of the Speedy Trial Act, the defendant ultimately pleaded guilty to a one-count information charging him with conspiracy to commit securities fraud. For the reasons discussed below, [redacted] the government submits that the sentence set forth in the parties' plea agreement pursuant to Rule 11(c)(1)(C)—which includes incarceration for a period of time served (approximately 3.5 months), nine months of home detention, and between than $6.5 and $8.19 million in forfeiture—is sufficient but not greater than necessary in this case. Accordingly, the government respectfully requests that the Court issue the agreed-upon sentence.

**FACTUAL BACKGROUND**

The defendant is a citizen of the People's Republic of China, where he primarily resides. During the relevant time period he also visited the United States regularly and owned residences in Marlborough and Weymouth, Massachusetts. The market manipulation scheme that he led involved at least eight co-conspirators, all of whom he hired and all but one of whom lived and worked exclusively in China (the exception was an individual who, like the defendant, also visited the United States on a regular basis). The co-conspirators worked for the defendant's companies in China and the defendant controlled the profits the co-conspirators generated as part of their scheme—namely, at least approximately $8,191,874.80 (as discussed further below).

The scheme involved artificially affecting the prices of thinly traded securities on national securities exchanges in order to make money. To do so, the defendant and his co-conspirators exploited modern market structure, including specifically the role that private market makers and large brokerage firms play in providing market liquidity and price improvement for retail investors.

Today's securities markets are much more complex, fast, and automated than the bygone days when securities were traded on the floor of the New York Stock Exchange through human interactions. While securities can and do still trade in large part through the national stock exchanges, where offers to buy and sell securities are matched against each other in automated electronic transactions, a very significant portion of today's securities trades involve "non-exchange venues." These non-exchange venues include market makers who stand ready to buy and sell securities from their own inventory as well as large brokerage firms that sometimes execute their customers' orders from their own inventory. These non-exchange venues tend to operate at fast speeds using algorithms to direct their trading. To ensure that investors receive

"best execution"—i.e., the most favorable possible price under prevailing market conditions—regulations put in place by the U.S. Securities & Exchange Commission generally require that brokers ensure that their customers trade at prices equal to or better than the national best available offer to buy a particular security (if the customer is selling) or to sell the security (if the customer is buying) as reflected on the national exchange at the time of the trade (known as the NBBO, or National Best Bid and Offer). Given this requirement, when brokers route their customers' orders to non-exchange venues, the venues in turn generally execute the trades at prices at least equal to the NBBO. In addition, to win brokers' business, the non-exchange venues often execute at prices better than the NBBO (a practice known as price improvement), which provides a benefit to the brokers' customers – *i.e.*, to retail investors—who receive a better price. The non-exchange venues themselves nevertheless still profit based on arbitraging the remaining spread between the overall offers to buy and offers to sell securities in the market (the "bid-ask spread").

The defendant and his co-conspirators took advantage of this market structure to line their pockets with profits generated from fraudulent market manipulation. Specifically, using multiple brokerage accounts in different individuals' names simultaneously, the co-conspirators worked in small teams to strategically place small trades that would manipulate the price (*i.e.*, the NBBO) of thinly traded securities and then place much larger trades on the other side of the market intended to execute at non-exchange venues to capitalize on the artificial price movements they had generated. The scheme involved using these tactics to both push securities prices artificially down as well as artificially up. To push prices down, the co-conspirators would place small sell orders, often for 100 shares, at exchange venues at prices designed to give a false signal about a security's supply and to drive down the prevailing best offer to buy the

security. Once the price was depressed, the co-conspirators would then place a large buy order intended to execute at the depressed price at a non-exchange venue, thereby ensuring that the large buy order would not execute against the small sell orders simultaneously placed at exchange venues. Once the large order was executed, the co-conspirators would then cancel their outstanding (manipulative) sell orders, thereby confirming that the sell orders were not bona fide. The co-conspirators would then simply reverse this process later that same day in order to artificially inflate the security's price and then sell their shares at an artificially inflated price. The Information (Dkt. #104) and the Presentence Investigation Report ("PSR") (¶¶ 22-26) highlight six examples of these manipulations between June of 2014 and May of 2018.[1]

The scheme generated small profits on a per-trade basis, but enormous profits overall. As a general matter, the scheme intended to manipulate securities prices by at least several cents per instance and at times more than $0.25 per instance. As a result, the scheme generated illicit proceeds generally in the range of hundreds to thousands of dollars on a per instance basis. The defendant and his co-conspirators nevertheless ultimately generated millions in illicit proceeds by repeating this process thousands of times during the conspiracy.

A key to their fraudulent market manipulation was the co-conspirators' use of brokerage accounts in multiple different individuals' names simultaneously. Over the course of the conspiracy, the co-conspirators used at least 140 different brokerage accounts. The accounts were in the co-conspirators' names as well as in the names of family members and other nominees. For example, among the accounts used were accounts in the name of the defendant's

[1] The securities that were the subject of these manipulations were Institutional Financial Markets Inc. ("IFMI"), AmeriServ Financial Inc.'s Capital Trust I Preferred ("ASRVP"), CHS Inc.'s 8% Preferred Shares ("CHSCP"), SPAR Group Inc. ("SGRP"), Ultragenyx Pharmaceutical Inc. ("RARE"), and Helen of Troy Limited ("HELE").

spouse, defendant's father-in-law, and an individual in the United States with whom the defendant had a personal relationship. At times, the brokers that handled the co-conspirators' accounts would question their trading activity; to conceal their misconduct, the defendant and his co-conspirators crafted and sent false replies that purported to explain the trading with innocuous explanations, such as that the trading was the result of inadvertently hitting the wrong key on their computer. And when brokers shut down their accounts based on the suspicious trading, the co-conspirators simply opened new ones at different brokers or in different individuals' names.

## PROCEDURAL BACKGROUND

The defendant was arrested on a criminal complaint on October 14, 2019, while he was in the United States. (Dkt. #1.) He was initially detained pending trial but later released on bond on January 24, 2020 under home detention with a curfew and GPS monitoring. (Dkt. #49.) A grand jury later returned an indictment on May 24, 2022, charging the defendant with conspiracy to commit securities fraud and conspiracy to commit market manipulation. (Dkt. #79.) On June 29, 2022, the defendant moved to dismiss the indictment for violation of the Speedy Trial Act and his Sixth Amendment right to a speedy trial.[2] The government opposed the motion. At a hearing on the motion on July 28, 2022, the Court dismissed the indictment without prejudice. (Dkt. #103.) The following day, the parties reached a plea agreement and the government filed the operative Information, which charged the defendant with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349. (Dkt. #104.) The defendant waived indictment and pleaded guilty on August 5, 2022.[3] (Dkt. #109.)

[2] The motion was filed under seal, as was the government's brief in opposition.

[3] The day after the defendant's 2019 arrest, the SEC also filed a parallel civil enforcement action against the defendant and 17 others, as well as against six relief defendants. *See SEC v. Chen*, 19-cv-12127-WGY (Dkt. #1) (Complaint). While the parallel civil case was effectively stayed as to the defendant pending the outcome of this criminal matter, the Court in the SEC matter ultimately entered a

## PLEA AGREEMENT & GUIDELINES RANGE

The parties' plea agreement was reached pursuant to Rule 11(c)(1)(C) and provides an agreed-upon disposition, subject to the Court's acceptance of the plea agreement. (Dkt. #105). That disposition entails: (i) incarceration for a period of time served (approximately 3.5 months); (ii) supervised release for nine months, with a condition of home detention for 22 hours per day and a prohibition on trading securities[4]; (iii) forfeiture of at least $6.5 million and up to $8.23 million (as discussed below, the government is seeking $8.19 million in forfeiture); (iv) no fine; and (v) a $100 special assessment. Regarding the defendant's supervised release period, the parties further agree that the defendant shall receive credit for the time following his guilty plea during which his conditions of release are consistent with his anticipated supervised release conditions. The defendant's conditions of release were so modified as of August 8, 2022, providing him just under four months of credit as of his November 30, 2022 sentencing date. (Dkt. #109.)

The government agrees with guidelines range calculated by Probation and, as reflected in the parties' plea agreement, the defendant does not dispute that the government could establish the applicability of that range. As calculated by Probation and the government, the defendant's total offense level is 28, which, given the defendant's lack of a criminal history, results in a sentencing guidelines range of 78 to 97 months.

---

default judgment against a majority of the remaining defendants and ordered over $35 million in disgorgement on a joint and several basis. *See id.* (Dkt. #200) (Final Judgment as to Defaulting Defendants).

[4] More specifically, the defendant is to be restricted to his residence for 22 hours per day except for medical necessities, court appearances, attorney meetings, or other activities specifically approved by the Court, and he is to be restricted from trading securities, either directly in accounts in his name or indirectly in accounts in others' names, other than to liquidate securities for purposes of facilitating forfeiture if requested by the U.S. Attorney's Office.

The parties' plea agreement also includes an appeal waiver, pursuant to which the defendant gives up his right to appeal his conviction, including any appeal he might otherwise have pursued regarding application of the Speedy Trial Act.

**ILLICIT PROFITS & FORFEITURE AMOUNT**

Consistent with the nature of today's securities markets, calculating the illicit profits generated by the defendant's scheme is a complex undertaking. As the Court is aware, the SEC undertook an extensive effort to calculate those profits for its parallel civil enforcement action. Specifically, staff from the SEC's Division of Economic and Risk Analysis ("DERA"), who have extensive academic and professional qualifications in financial and statistic evaluations, analyzed the co-conspirators' trading records for this purpose. *See SEC v. Chen*, 19-cv-12127-WGY (Dkts. #6, 75-4, 170-1) (Walster & Canjels Decls., collectively the "DERA Declarations"). While the SEC's analysis was not prepared for the government's criminal prosecution nor at the U.S. Attorney's Office's request or direction, the government has gone to great lengths to familiarize itself with the SEC's analysis, which is rigorous, reliable, and designed to identify trades made as part of the scheme and the profits generated from them. And while the government would likely have engaged its own separate expert(s) to calculate illicit profits should this matter have proceeded to trial (as the government does in the ordinary course), the government submits that the Court can and should rely on key aspects of SEC's analysis (as described further below) to make a reasonable determination of the scheme's criminal profits and the defendant's total criminal forfeiture amount. That figure, the government contends, is $8,191,874.80.

As described in the PSR (¶¶ 29-34) and the DERA Declarations, the model involves an analysis of the available trading records for the over 140 brokerage accounts involved in the

scheme.[5] To identify the trades in which the co-conspirators capitalized on their market manipulations, the analysis first involved identifying instances in which multiple accounts placed orders for the same security on both the buy side and sell side of the market simultaneously at prices that, if the orders were both routed to an exchange, would result in the orders executing against each other. (As part of the scheme, the co-conspirators' orders generally were not both routed to an exchange; the orders intended to capitalize on the market manipulation generally were routed to non-exchange venues.) These instances are referred to as Coordinated Events. Next, to identify the sets of trades that would result in illicit profits, the analysis involved identifying instances in which the co-conspirators bought and sold the same number of shares of a security on the same day in two offsetting Coordinated Events. (In other words, the analysis identified instances when the co-conspirators purchased shares during an instance of market manipulation and then later sold the same shares that same day during a second instance of market manipulation.) For present purposes, these instances are referred to as Same-Day Matching Coordinated Events, and they represent the most conservative approach to calculating illicit profit under DERA's methodology. Next, the analysis involved summing the values of the trades for each account involved in each Same-Day Matching Coordinated Event to identify a total profit (or loss) for each cycle, which was generally in the hundreds or thousands of dollars. And finally, the analysis involved summing the profits (and losses) for all of the Same-Day Matching Coordinated Events. In total, the analysis found thousands of instances involving

[5] The DERA Declarations provide that over the SEC ultimately analyzed trading data for over 170 accounts. Because some of those accounts involved trading directed by one of the defendant's co-conspirators after leaving the defendant's conspiracy, the figures provided herein apply only to accounts used in connection with the defendant's conspiracy.

thousands of different securities in which the co-conspirators engaged in Same-Day Matching Coordinated Events, with the total net profits equaling $8,191,874.80.[6]

Given the thousands upon thousands of trades placed by the co-conspirators during the conspiracy period, both the parties and the Court necessarily must rely on a model to find a reasonable profits figure, and no model can identify with 100% certainty the absolute exact amount of illicit profits. The model employed by the SEC is a rigorous and reasonable one, and the $8.19 million figure identified above is in turn a reasonable one. It is also very conservative one, for multiple reasons. First, it represents the scheme's profits *only* from securities bought and sold in the same amounts on the same day in two Coordinated Events. As such, it does not include *any* profits associated securities bought in a Coordinated Event but later sold outside of a Coordinated Event later that same day, nor *any* profits associated with securities bought during a Coordinated Event but later sold the following day (either in or outside a Coordinated Event). Some amount of illicit profits, however, were undoubtedly generated by the defendants' market manipulations that permitted advantageous purchases at deflated prices even when the co-conspirators later sold the securities outside of Coordinated Events or the following day. Second, due to limitations on available trading records, the $8.19 million only accounts for profits beginning in October 2014, and not all the way back to 2013, when the conspiracy began. And third, the $8.19 million figure is a sum of both gains *and* losses associated Same-Day

[6] This figure represents a portion of the $35 million the SEC sought in civil disgorgement in the parallel civil action. Specifically, it represents the portion of profits relating to securities bought and sold in the same amounts on the same day in two Coordinated Events. The government understands that the larger figure also includes profits associated securities bought in a Coordinated Event but later sold outside of a Coordinated Event later that day, as well as securities bought during a Coordinated Event but later sold the following day (either in or outside a Coordinated Event). *See* Canjels Decl. ¶ 7.

Matching Coordinated Events, both within Coordinated Events themselves (i.e., the analysis includes subtracting the losses associated with individual market manipulations) and across all Same-Day Matching Coordinated Events (i.e., the analysis includes Same-Day Matching Coordinated Events in which the scheme lost, rather than made, money).

The defendant, nevertheless, contends that the model is unreliable. (PSR ¶ 35.) His complaints are not persuasive. First, the defendant's hypothetical about a "macroeconomic event" moving the price of security up $1 hours after the co-conspirators moved the price up $0.05 misses the mark because the nature of the scheme was that the co-conspirators sold their shares *immediately* upon moving the price up through their manipulations. In addition, to the extent the model could be considered to include price movements attributed to market-moving news during the period between the beginning and end of a Same-Day Matching Coordinated Event (as the defendant presumably contends), it necessarily includes both positive *and* negative news, so any non-manipulative price movements work both for and against the defendant's interests. Second, his contention that the model fails to include decisions to by or sell securities by third parties also misses the mark because the nature of the scheme was to take advantage of the fact that non-exchange venues were effectively *required* to execute at or equal to the NBBO, which the co-conspirators were manipulating. And third, the defendant's identification of six modestly well-known securities falling in Coordinated Events—out of the thousands traded in the scheme—to somehow undermine the model is much ado about nearly nothing: for two of the securities (Alibaba and Etsy), the model identified *net losses* based on the Coordinated Events,

and for the other four (Carvana, Columbia Sportswear Co., CarGurus, Inc., and Cheesecake Factory, Inc.), the model identified total net profits of approximately $14,603.[7]

For the above-stated reasons, the government respectfully contends that the illicit profits generated from the scheme—which profits the defendant controlled and distributed, including to himself—were at least $8,191,874.80, and that forfeiture in that amount should be ordered. *See United States v. Rogers*, 102 F.3d 641, 648 (1st Cir. 1996) (noting consensus view that criminal forfeiture is governed by the preponderance of the evidence standard).

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The below assessment of the § 3553(a) factors demonstrates that the parties agreed-upon sentence is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A. Nature and Circumstances of the Offense

As the Court noted at the hearing on the defendant's motion to dismiss, the defendant's crime is not a violent crime, and therefore is not among the most serious of crimes. Nevertheless, all forms of illegal market manipulation are serious, the defendant's included, which went on for approximately six years and was perpetrated from abroad. Market manipulation schemes harm the integrity and efficiency of the U.S. securities markets to the detriment of all investors. When investors believe the markets are rigged, or lose confidence in the integrity of the markets, the markets become less liquid, less attractive, and more volatile. And the nature of this particular scheme—which generated profits by causing non-exchange

[7] The government understands that the defendant has also submitted a report from David Tawil providing additional arguments aimed at undermining the model supporting the $8.19 million profits figure. The government received a copy of the report for the first time today. The government is reviewing it and will be prepared to address its contentions at the sentencing hearing.

venues to trade at artificial prices slightly below or above the true NBBO—likely caused real (even if diffuse) harm to retail investors. This is because the non-exchange venues, when trading with the defendant and his co-conspirators, very likely either lost money or made less money. As a result, the non-exchange venues likely decreased the amount of price improvement they were willing to offer retail investors to win brokers' business, to retail investors' detriment. The proposed sentence—which includes both a term of incarceration (in form of time served) plus additional restrictions on the defendant's liberty for a period of nine months—recognizes that the defendant's crime was serious, although not among the most serious in the criminal law.

**B. History and Characteristics of the Defendant**

The defendant's role as the leader of the scheme is an aggravating factor to consider when fashioning a just sentence in this case. The government acknowledges, however, the many mitigating factors found in the defendant's background, including his lack of a criminal history, the fact that he was not within a U.S.-based financial institution with rigorous compliance and training functions, and the extended length of time he has spent in the United States away from his family in China while this case has been pending.

[redacted]

[redacted]

[redacted]

**C. Deterrence, Promoting Respect for the Law, and Avoiding Disparities**

As the defendant's crime reflects, market manipulation schemes involving brokerage accounts in multiple individuals' names can be difficult to identify and relatively easy to reproduce when caught by particularly on-the-ball brokers. Accordingly, general deterrence and the need to promote respect for the law are important considerations when fashioning a just sentence for these types of crimes. Here, however, consideration should also be given to the fact that the defendant's scheme was not perpetrated by sophisticated securities professionals who trained in the United States and passed rigorous securities examinations. While the defendant knew that this form of market manipulation was illegal, his conduct did not involve flouting compliance protocols at his own firm (as others have done). In addition, as reflected in the defendant's sentencing memorandum, there are numerous instances in recent years in which cases involving similar market manipulation conduct has been charged only by the SEC and not criminally. And those cases that have resolved criminally have, as the defendant's sentencing memorandum recounts, often included sentences significantly below the guidelines sentencing rage. These facts and circumstances, along with those discussed previously above, mitigate the need for a sentence of any greater length than the sentence proposed by the parties.

## CONCLUSION

For the reasons discussed herein, the United States requests that the Court sentence the defendant to the agreed-upon sentence in the parties' plea agreement: namely, incarceration for a period of time served, nine months of supervised release on home detention for 22 hours per day, and forfeiture in the amount of $8,191,874.80.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ James R. Drabick*
James R. Drabick
Assistant United States Attorney
John Joseph Moakley Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
Tel: (617) 748-3100
james.drabick@usdoj.gov

Date: November 23, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be sent to those indicated as non-registered participants.

*/s/ James R. Drabick*
James R. Drabick
Assistant United States Attorney

Dated: November 23, 2022